## COLONIAL DISCOUNT COMPANY, INC. *v.* AVON MOTORS, INC., ET AL.

BROWN, C. J., JENNINGS, BALDWIN, INGLIS and O'SULLIVAN, JS.

Argued June 6—decided August 8, 1950

*James F. Rosen,* for the appellant (defendant Levin).

*David R. Lessler,* for the appellant (defendant Avon Motors, Inc.)

*Samuel H. Platcow,* for the appellee (plaintiff).

INGLIS, J.   The crucial question on this appeal is whether the plaintiff, assignee of a third party beneficiary, may maintain an action upon a contract between the defendants whereby it was agreed that the defendant Levin would finance his purchases and sales of used automobiles exclusively through the plaintiff's assignor.

The finding, which is not subject to correction in any material particular except in so far as it states conclusions not warranted by law and except as hereinafter stated, discloses the following facts: For some time prior to September 18, 1946, the defendant Avon Motors, Inc., hereinafter referred to as Avon, was engaged in the business of buying and selling used automobiles. It did some of its financing with the Colonial Finance Company, Inc., hereinafter referred to as the Finance Company, and some with another company.   Benjamin Banet, the president of Avon and the operator of its business, planned to go to Florida for an extended stay. For that reason he desired to arrange matters so that the defendant Levin could go into the used car business on his own account at Avon's place of business.   In connection with his plans Banet conferred with Benjamin Spitzer, president both of the Finance Company and of the plaintiff, for the purpose of arranging to have

all of Levin's financing done through the Finance Company, but it does not appear that Banet in any way bound himself or Avon to Spitzer in that conference.

On September 18, 1946, the defendants entered into a written lease whereby Avon leased its place of business together with all of the personal property and equipment contained therein to Levin for a term to begin on October 14, 1946, and from month to month thereafter for the purpose of conducting a used car business. The lease contained the following terms:

"18. [T]he Lessee covenants and agrees to and with the Lessor, that all financing of the motor vehicles acquired, held or sold by the Lessee in the conduct of his business from the demised premises shall be done and performed by him through and with The Colonial Finance Company, Incorporated, . . . and that he will not, directly or indirectly, finance any of such automobiles either by floor plan or retail financing with or through any other person, firm or corporation but the said The Colonial Finance Company, Incorporated.

"In consideration of the covenants contained in this Paragraph, the Lessor doth covenant and agree to and with the Lessee that all floor plan financing required by the Lessee and accomplished by or through the said The Colonial Finance Company, Incorporated, will be unconditionally guaranteed as to payment to the said The Colonial Finance Company, Incorporated, by the Lessor, for the benefit of both the Lessee and the said The Colonial Finance Company, Incorporated.

"It is understood that all retail financing done by the Lessee with or through said The Colonial Finance Company, Incorporated, will be on a 'with re-purchase' basis and the Lessor will guarantee to the said The Colonial Finance Company, Incorporated, the faithful performance by the Lessee of his 're-purchase' agreements with such finance company."

On the same day, Levin also executed another instrument in which he again covenanted with Avon that he would conduct no financing business with anyone other than the Finance Company and assigned to Avon any and all "dealers' reserves" due or to become due to him from the Finance Company by virtue of any automobile financing done by him through or with it during the continuance of the lease.

In connection with the execution of these documents, Levin executed and delivered to the Finance Company a so-called reserve agreement whereby he requested it to purchase acceptable promissory notes, chattel mortgages and other security agreements acquired by him from retail purchasers of automobiles. In this agreement, which contained a provision for the maintenance of a dealer's reserve, there was no commitment on Levin's part to do business exclusively with the Finance Company. In addition, he furnished it with a "dealer's financial statement" which contained a guarantee and waiver executed by him, his wife and Banet. Levin and the Finance Company filed with the secretary of the state of Connecticut the statement of trust receipt financing which under the law may be filed by any persons who intend to use trust receipts as a method of financing and which, when filed, protects an entruster as against creditors of his trustee. General Statutes §§ 6556, 6557.

Levin did not at any time finance the motor vehicles acquired or sold by him in the conduct of his business by either floor plan or retail sales financing with the Finance Company; he did all of his financing with the Associates Discount Corporation. On two occasions Levin told the president of the Finance Company that Banet had instructed him not to give any business to it. The Finance Company was a subsidiary of the plaintiff. On December 2, 1946, it assigned to the plaintiff

all of its rights and claims under the contract between Avon and Levin, and on January 10, 1947, it ceased to do business.

The trial court concluded that the provisions of the lease between the defendants which bound Levin to do his financing with the Finance Company exclusively were intended for the benefit of the Finance Company and could be enforced by its assignee, that Levin had breached the lease and that Avon, acting through its president, had caused that breach. The defendants made the claim in the trial court that the contract was not of such a nature that the plaintiff as the assignee of a third party beneficiary could sue thereon.

The law of this state on the subject of when a third party beneficiary under a contract may sue for a breach of that contract is now definitely determined by *Baurer* v. *Devenis,* 99 Conn. 203, 121 A. 566, and *Byram Lumber & Supply Co.* v. *Page,* 109 Conn. 256, 146 A. 293. It is the intent of the parties to the contract which governs. We defined the necessary intent in the *Byram* case (p. 259) as follows: "[T]he intent which must exist on the part of the parties to the contract in order to permit the third party to sue was not a desire or purpose to confer a particular benefit upon him, but an intent that the promisor should assume a direct obligation to him."

To determine the intent of the parties to a contract is a matter of interpretation of the contract. The intent of the parties expressed in a contract is not synonymous with the purposes or motives of those parties in making the contract. In ascertaining such intent, however, all of the circumstances surrounding the making of the contract must be taken into consideration; *Byram Lumber & Supply Co.* v. *Page,* supra, 261; and the motives of the parties and the ends which they sought to accomplish by their contract are relevant. The law in

this jurisdiction is, therefore, that the ultimate test to be applied is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party and that that intent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties.

The Restatement of the Law of Contracts and Williston adopt a somewhat different approach. They both classify third party beneficiary contracts in three categories: Those in which the beneficiary is a donee beneficiary, those in which he is a creditor beneficiary and those in which he is an incidental beneficiary. Restatement, 1 Contracts § 133; 2 Williston, Contracts (Rev. Ed.) § 356. Williston defines the beneficiaries in these classes of contracts as follows: (1) A third person beneficiary under a contract is a donee beneficiary if the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary; (2) such person is a creditor beneficiary if no intention to make a gift appears from the terms of the promise, and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary; (3) such person is an incidental beneficiary if the benefits to him are merely incidental to the performance of the promise and if he is neither a donee beneficiary nor a creditor beneficiary. It is stated in both the Restatement and Williston that if a third party is either a donee or a creditor beneficiary he may maintain an action on the contract against the promisor. If he is an incidental beneficiary, he may not.

Thus, the ultimate test adopted by these authorities

is different from that laid down in *Byram Lumber &
Supply Co.* v. *Page,* supra.   As stated by the Restate-
ment and Williston, the final test is whether the third
party is a donee or a creditor beneficiary.   As stated
by this court, the final test is whether the intent of the
parties to the contract was that the promisor should as-
sume a direct obligation to the third party.   For practi-
cal purposes, in almost all cases, however, the difference
is more apparent than real because, after all, the crea-
tion of the relationship of donee or creditor beneficiary
would ordinarily entail a direct obligation by the prom-
isor to the third party.   To classify a contract as a
donee or a creditor or an incidental beneficiary con-
tract, as defined by Williston, is an aid in determining
what the intent of the parties was.   In the final analy-
sis, however, the real test to be applied to all contracts
is, as laid down in the *Byram* case, supra, whether the
intent of the parties was to create a direct obligation
from the promisor to the third party.

When we apply that test to the contract involved in
the present case, it is quite apparent from the contract
itself, viewed in the light of the motives of the parties
and the purposes they sought to accomplish, that it was
not their intent to create a direct obligation from Levin
to the Finance Company.   It was not the purpose of
Avon to make a gift to the Finance Company by con-
ferring upon it the benefit of such a direct obligation.
There was no motive to induce such a purpose.   On
the contrary, all of the attendant circumstances found
to exist indicate that Banet's sole purpose in exacting
the promise from Levin was to protect the interests of
Avon.   Nor, so far as the finding discloses, was there
any debtor-creditor relationship between Avon and the
Finance Company in which Levin was to be substituted
for Avon.   Avon had not agreed that it would do its
financing exclusively with the Finance Company.

True, Avon was agreeing that in the future it would become obligated to the Finance Company on a guarantee of Levin's indebtedness, but that is quite a different obligation from an agreement on Avon's part to do business exclusively with the Finance Company. In other words, this was not a case in which Levin was agreeing to perform an obligation of Avon to the Finance Company. In short, there was nothing to indicate any intent of Avon and Levin that the latter should by reason of this clause of the contract owe a direct obligation to the Finance Company to do business with it exclusively.

It is true that a benefit to the Finance Company might eventuate from Levin's performance of his agreement. That is the benefit which the trial court obviously meant when it concluded that the parties intended to confer a benefit upon the Finance Company. It was, however, a merely incidental benefit. From the fact that the parties intended that the Finance Company would gain such an incidental benefit it does not follow that their intention was that Levin would assume a direct obligation to the Finance Company. See *Constable* v. *National Steamship Co.*, 154 U. S. 51, 77, 14 S. Ct. 1062, 38 L. Ed. 903; *Klingler* v. *Wick*, 266 Pa. 1, 5, 109 A. 542; *Hollister* v. *Sweet*, 32 S. D. 141, 147, 142 N. W. 255.

In reaching the conclusion that the contract should be so interpreted that the Finance Company was entitled to sue for the breach of Levin's promise, the trial court applied the wrong test. The test which it applied was whether the parties to the contract intended to confer a benefit upon the Finance Company. As is pointed out in *Byram Lumber & Supply Co.* v. *Page*, 109 Conn. 256, 260, 146 A. 293, that the parties did intend to benefit the third party is not enough. The true test is whether their intent was to create a direct

obligation of the promisor to the third party. That such was their intent as expressed in the contract the trial court did not determine. Indeed, in the light of all of the attendant circumstances as found, such an interpretation of the contract would not have been warranted. Accordingly, there was no foundation for the trial court's conclusion that the plaintiff's assignor was such a beneficiary of Levin's covenant with Avon that the plaintiff could maintain suit for breach of that covenant.

There is a further error which also requires a new trial. That is in the method by which the amount of damages was determined. The trial court ascertained the total amount of finance charges which would have been earned upon the financing which was done by Levin during the period in question, deducted therefrom 10 per cent to cover overhead and awarded as damages the resultant amount. The correct measure of damages for the breach of such a contract as was claimed in this case is the net profit which the Finance Company would have made if the contract had been performed. It is the gross income which would have been derived from the business less the total cost to the Finance Company of doing that business. See *Kastner* v. *Beacon Oil Co.*, 114 Conn. 190, 193, 158 A. 214. The finding in the present case must be corrected by adding thereto the fact that the Finance Company at times borrowed money from banks at 3 per cent per annum to handle its time and floor plan financing business. There is no finding that it would not have had to borrow for the purpose of financing Levin's paper. If it would have had to do so, its interest charges should be deducted in determining its net profit on the business. To recover loss of profits as an element of damage, it was incumbent on the plaintiff to prove with reasonable certainty what that loss was. *Doeltz* v.

*Longshore, Inc.,* 126 Conn. 597, 600, 13 A. 2d 505; 1 Sutherland, Damages (4th Ed.) § 59. Under the circumstances of this case, in the absence of proof by the plaintiff establishing at least a probability that the Finance Company would not have had an interest charge to pay as part of its expense in doing Levin's financing, the amount of profits on the business was too speculative to form the basis of an award.

Since a new trial must be had, it is unnecessary to discuss the claim of Avon that the trial court was not warranted in concluding that it had caused Levin to breach his contract because the only evidence tending to prove that fact was hearsay. The other assignments of error lack foundation either in the pleadings or in the finding of facts or in the claims of law made upon the trial.

There is error, the judgment is set aside, and a new trial is ordered.

In this opinion the other judges concurred.